THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. BRIAN DOYLE, Defendant-Appellant.

First District (1st Division)   No. 1—93—2254

Opinion filed February 4, 2002.—Rehearing denied March 14, 2002.

Erika Cunliffe, of Cleveland Heights, Ohio, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Kenneth T. McCurry, and Katherine Blakey Cox, Assistant State's Attorneys, of counsel), for the People.

JUSTICE COUSINS delivered the opinion of the court:

The defendant, Brian Doyle, was charged with unlawful use of a weapon and four counts of first degree murder for the deaths of Khalid Malcome and Nathan Fowler. He was tried only on the murder counts. On October 26, 1991, the first trial culminated in a hung jury and mistrial because the jury could not come to a unanimous verdict. A second jury, empaneled on January 19, 1993, found him guilty of both murders. He was sentenced to a term of natural life without parole.

Defendant appealed alleging: (1) the trial court failed to find him guilty beyond a reasonable doubt at the first trial and therefore erred by not directing a verdict of acquittal; (2) the trial court erroneously denied his motion to dismiss for *Brady v. Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963), violations; (3) prosecutorial misconduct; (4) the trial court erred in allowing certain evidence at trial; (5) ineffective assistance of counsel; and (6) cumulative errors denied him a fair trial.

## BACKGROUND

On April 1, 1991, at approximately 6 p.m., the Chicago police department received two "911" calls reporting shootings at Rick's Arcade located at 5111½ West Division Street in Chicago. These shootings left Khalid Malcome and Nathan Fowler dead. The first "911" call came from Shalanda Allison. She told the "911" operator that people were shooting at the arcade across the street; a man came from

the arcade and tried to enter the day care center where she was employed; she did not let him in; and the man had a gun.

The second "911" call came shortly thereafter from Danny Smith. Smith was the man that Ms. Allison had spoken about in her "911" call. He told the police that a "guy named Brian shot both of [his] friends in the head at the arcade" and that he was at 5315 W. Potomac. The police came and picked up Smith. That day, he told the police what happened at the arcade but did not tell them that he had a gun.

The following testimony was adduced at the trial. Before the shooting occurred, a group of approximately 15 young men assembled at Rick's Arcade to gamble or to watch others gamble. The defendant, Brian Doyle, Isaac Upchurch, Eric Lockhart and Ricardo Walls were among those in the group. Sometime between 5 p.m. and 6 p.m. there was a knock at the door of the arcade. Brian Doyle looked out the front window and told others that Danny Smith and Khalid Malcome were there. Others, who were gambling in the back, told Doyle not to let Smith and Malcome in the arcade. Doyle did not open the door.

Smith and Malcome continued to bang loudly on the door until Eric Lockhart, who was friendly with both men, opened the door. Malcome was angry that Doyle did not open the door and began to argue with him. Malcome asked Doyle why he did not open the door. Doyle replied that he was told not to let them in the arcade. Malcome responded "those pussy mother fuckers get you hurt." An argument ensued, and during the course of the 15-minute argument, Doyle asked if this was an "Insane set," meaning, was the arcade controlled by the Insane Vice Lords street gang. Malcome responded that it was and that "I might be one of your chiefs." Doyle replied: "I don't know who you is, you don't mean nothing to me." Doyle mumbled or whispered something under his breath, to which Malcome responded, "[S]peak up because only whores and bitches whisper." Doyle then said "let me get out of here before I snap." Either during the argument or shortly after Brian Doyle left, Nathan Fowler arrived to pick up one of the other men playing dice.

Further trial testimony was adduced. About 10 to 15 minutes after the argument, there was a knock at the door followed by a voice saying, "[W]hat's up now nigger?" The sound of gunshots followed. Then the shooter, later identified by Danny Smith, Isaac Upchurch, Eric Lockhart and Ricardo Walls as the defendant, said "I'm a whore?" "I'm a punk?" The defendant continued to shoot two to four more times. Then several more shots were fired from what witnesses characterized as a "different sounding" gun.

When the shooting was over, Khalid Malcome and Nathan Fowler

had both sustained gunshot wounds to the head. They died of their injuries. Danny Smith testified that he saw the defendant shoot both Malcome and Fowler and then try to shoot him. Smith testified that after the defendant tried to shoot him, he fired at the defendant with a .22-caliber handgun three times. Smith ran toward the exit but was unable to get out of the building; a door or large board fell on him and trapped him momentarily. Smith was not shot during the incident.

Smith then ran across the street to the day care center with his gun still in his hand and knocked on the door trying to get inside. Shalanda Allison called "911" during this period. When Smith could not get into the day care center, he told Ms. Allison to call the police and that his friends had just been shot. Smith then drove to his girlfriend's house nearby and called "911." After the shooting had ended, Lockhart had come back into the room where Smith was lying under the door and asked if he had been shot. Lockhart ran to his friend's house a block away.

The police met Smith at his girlfriend's house and took him back to the scene. There, Officer Franklin interviewed witnesses including Smith, Lockhart, Upchurch and Walls. Each identified the shooter as Brian, also known as "Dog," but they did not know his last name.

Smith, Lockhart, and Upchurch testified at the first trial. Ricardo Walls, manager of the game room, did not testify at the first trial. Smith testified at trial that he had a gun in his back pocket which he used to shoot back at the defendant. The information about his gun was not given to the police, and Smith testified about this information before the grand jury. In late April or May, Smith told the assistant State's Attorneys that he too had a gun and fired it in self-defense on April 1, 1991. Smith said that he gave the gun to a friend named Wolf. Smith told the assistant State's Attorneys that Wolf could be found at the corner of Maypole and Pulaski streets. An assistant State's Attorney contacted Detective Dorsch shortly thereafter and requested that he search for the gun and Wolf. Detective Dorsch determined that Wolf's real name was Charles Moore and that he was murdered in May. Smith's gun was never recovered.

On April 20, 1991, Officer Baltazar received information regarding the location of Brian Doyle. The record indicates that two arrest warrants for Brian Doyle had issued on April 5, 1991. Officer Baltazar arrested Doyle on April 20, 1991.

The first trial began in October of 1991. It ended in a hung jury and the trial judge declared a mistrial. The second trial began in January 1993. Ricardo Walls was among the witnesses that testified at the second trial. Danny Smith had passed away before the second trial. His testimony was read into the record by the defense. The second jury returned a guilty verdict on both charges of first degree murder.

Defendant appeals. We affirm.

## ANALYSIS

■ Defendant alleges that the State failed to prove at the first trial that he was guilty beyond a reasonable doubt for the murders of Malcome and Fowler. In addition, defendant contends that the second trial violated the fifth amendment's double jeopardy clause. Specifically, the defendant claims he was denied due process when the trial court failed to direct a verdict of acquittal at the first trial and subsequently allowed a new trial. We disagree. When a mistrial is properly declared solely on the basis of the inability of the jury to reach a verdict, retrial does not result in double jeopardy, regardless of the sufficiency of the evidence at the first trial. *People v. Hobbs*, 301 Ill. App. 3d 581, 589, 703 N.E.2d 943 (1998); *Richardson v. United States*, 468 U.S. 317, 326, 82 L. Ed. 2d 242, 251, 104 S. Ct. 3081, 3086 (1984). Defendant also claims that he was denied due process based on the prosecutor's failure to comply with the requirements of *Brady v. Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963), and Illinois Supreme Court Rule 412(c) (134 Ill. 2d R. 412(c)). Defendant also claims that the trial court abused its discretion when it did not dismiss the case based on the *Brady* violations.

■ To prevail on a *Brady* violation claim the defendant must demonstrate the following: (1) the evidence must be favorable to the defense, either exculpatory or impeaching; (2) the evidence must be suppressed by the State; and (3) prejudice must have ensued. *Stickler v. Greene*, 527 U.S. 263, 281-82, 144 L. Ed. 2d 286, 302, 119 S. Ct. 1936, 1948 (1999). The defendant in this case argues that the information concerning Smith's gun was favorable to the defense. The fact that more than one person was firing opens the door to the possibility that another may have been the shooter. The record establishes that the State was made aware of Smith's gun in late April or early May of 1991. Defendant contends that this information was not provided to the defense until the start of trial in October of 1991. Finally, defendant argues that prejudice ensued because the defense discovered the information immediately before the first trial and did not have adequate time to investigate this development.

■ We agree that information regarding Smith's gun should have been provided to the defense more timely. However, we do not agree that a *Brady* violation occurred. Although the State should have disclosed the information concerning Smith's gun earlier in the investigation, the defendant was aware of the gun before the first trial. Moreover, testimony about the gun came out at the first trial. Smith testified on direct examination about the gun and the defense

was able to cross-examine all of the witnesses that had knowledge of the gun. Relative to this issue, the following testimony was adduced by Smith on direct examination:

"MS. BURNETT [Assistant State's Attorney]: Then what happened?

MR. SMITH [Witness]: Then he was walking like back towards out [*sic*] gambling room, and he is seeing the door moved and he started coming back.

Q. Toward you?

A. Toward me.

Q. What happened then?

A. Then that's when I pulled the gun out my back pocket.

Q. What kind of gun did you have in your back pocket, Danny?

A. .22 revolver.

Q. What did you do when you pulled that gun out?

A. I fired it.

Q. How many times did you fire it?

A. Two or three times."

The following testimony was adduced during cross-examination:

"MR. JONES [Defense Attorney]: You say you told the State's Attorney about the gun. You told Marie Burnett; is that right?

MR. SMITH [Witness]: Yes, it is.

Q. You told Chris Donnelley?

A. Yes, sir, I did.

Q. When did you tell?

A. After I found out who they was.

Q. When did you tell?

A. A month after it happened.

Q. A month after it happened. So, did you tell in May of 1991 about the gun?

A. I don't recall the date."

Also, Shalanda Allison testified for the defense and gave the following testimony on direct examination:

"MR. JONES [Defense Attorney]: Now tell the ladies and gentlemen of the jury what happened? When you heard the gun fire, what did you do?

MS. ALLISON [Witness]: I was sitting in the back office. When we heard the shots, we ran to the front door where we saw a young man running across the street with a gun in his hands. After I saw the gun I immediately just went and called the police.

Q. Now you say that this person had a gun in his hands?

A. Right.

Q. Now how did you know it was a gun?

A. That was the first thing I glanced at."

8

The following testimony was given on cross-examination:

"MR. DONNELLEY [Assistant State's Attorney]: This gun did he ever point it at you?

MS. ALLISON [Witness]: No, he was waving it around.

Q. Did he ever threaten you with this gun?

A. No

Q. He never used to [*sic*] the gun to try to force his way in?

A. No.

Q. Counsel asked you several times if the police ever came and talked to you. Did you ever tell the police the information that you had about this person?

A. No, I never talked to a policeman.

Q. The person that had the gun in his hands, did it appear to be a small gun?

A. It was a hand gun.

Q. Small gun?

A. Right."

The foregoing testimony of Smith and Allison was adduced at the first trial. Also, Allison testified at the second trial and the testimony of Smith was read into evidence at the second trial. In our view, the defendant suffered no constitutional violation under *Brady* in this case.

Moreover, no prejudice resulted from the State's late disclosure of Smith's gun. In fact, the defendant relied upon the theory that Smith had a gun and was the shooter as part of his defense theory at both trials. To prevail on the *Brady* claim, defendant must show that the favorable evidence reasonably could be taken to put the whole case in such a different light as to undermine the confidence in the verdict. *People v. Coleman*, 183 Ill. 2d 366, 393, 701 N.E.2d 1063 (1998). The information regarding Smith's gun, although turned over to the defense late, does not undermine the confidence in the verdict. The defendant was able to ask the jury to draw inferences from the facts surrounding the investigation of the gun, the fact that the gun was never recovered and the fact the gun was fired at the scene of the crime. The jury chose not to accept the defense's theory.

■ The defendant also claims that the following discovery violations on additional issues interfered with his ability to cross-examine witnesses: (1) the State failed to disclose that Erik Lockhart had two drug cases pending instead of one; (2) delivery of the "911" tapes, one of which disclosed Shalanda as a witness who saw Danny Smith with a gun after the shooting, was delayed; (3) on November 4, 1992, the day the retrial was to begin, although Brian Tillman was not included on a witness list, the State sought and obtained a continuance until January to obtain him as a witness and then by the next trial date the

State abandoned Tillman and obtained another continuance in order to obtain Ricardo Walls as a witness; (4) although Ricardo Walls was not a witness at the first trial, the State obtained his testimony during the second trial and prevented the defense from interviewing him in advance of trial; and, further, the defense claims that Walls knowingly testified falsely; (5) the State failed to timely disclose an agreement reached with Eric Lockhart; and (6) the State did not disclose a cancelled check that had issued to Eric Lockhart in the amount of $1,686 until after the defendant had been convicted and sentenced.

Relative to these claims, the State contends that defendant has waived claims 1, 2 and 3 because the defendant did not raise those claims in his posttrial motion for acquittal or new trial. An examination of the record indicates that these claims were not raised in posttrial motions. Accordingly, claims 1, 2 and 3 have been waived. *People v. Enoch*, 122 Ill. 2d 176, 186, 522 N.E.2d 1124 (1988).

Waiver aside, however, in our view, these claims are not well founded. As to the first claim, Eric Lockhart testified in the first trial. Our examination of the record indicates that Eric Lockhart did not have two drug cases pending when he testified.

Relative to the second claim, regarding the delay in producing the "911" tapes, the tapes were produced before the first trial and Ms. Allison, whose "911" call was recorded, testified at both the first and second trials. In our view, an earlier production of the tapes would not have led to the gun or altered the outcome of the trial.

Relative to the continuance the State obtained to add Brian Tillman as a witness, the State represents that Brian Tillman's real name was not known until after the first trial. Importantly, however, Brian Tillman did not testify. No prejudice is shown.

Relative to the testimony of Ricardo Walls, the court ruled that the prosecution was not required to disclose Ricardo Walls' whereabouts and that, once he testified, the defense would be given a continuance if further investigation was needed. The prosecution represented that Walls' safety was involved and offered to present evidence of intimidation. Also, regarding the false testimony by Walls, the parties stipulated that a part of Ricardo Walls' testimony was false. In our view, no prejudice is shown.

Finally, regarding Eric Lockhart, the record indicates that he testified at the first trial. The prosecution represented that the State paid the moving expenses of Eric Lockhart and had his family move because Lockhart had been threatened between the two trials. The details of the arrangement were disclosed to the defense and heard by the jury at trial. Lockhart testified that the State's Attorney's office gave him and his family money to relocate to another apartment. The jury heard

testimony that Lockhart had received a check. Again, in our view, no prejudice is shown, no *Brady* violation occurred and the trial court did not err in denying defendant's motion to dismiss.

■ The defendant also claims that his right to due process was violated because the prosecution elicited or failed to correct false testimony from its witnesses. The standard by which this court is to review the alleged false statements has been established by both the United States Supreme Court and the Illinois Supreme Court. A conviction obtained by the knowing use of perjured testimony must be set aside if there is any reasonable likelihood that the false testimony could have affected the jury's verdict. *People v. Olinger*, 176 Ill. 2d 326, 345, 680 N.E.2d 321 (1997), citing *United States v. Bagley*, 473 U.S. 667, 678-80, 87 L. Ed. 2d 481, 492, 105 S. Ct. 3375, 3381-82 (1985).

■ The defendant claims that Joyce Malcome, the mother of Khalid Malcome, lied when she testified that she last saw her son alive boarding a bus to go to school on April 1, 1991. This testimony came out at the first trial and was challenged by the defense. The defense elicited testimony from others that Malcome skipped school and was spending the days with his friends. The State then used the testimony of Joyce Malcome at the second trial. The issue, however, has been waived because the defendant did not object to this testimony at trial or in a posttrial motion. *Enoch*, 122 Ill. 2d at 186-87.

However, in our view, even were this issue not waived, no due process violation has been shown. Joyce Malcome testified that the last time she saw her son he was getting on the bus to go to school. The fact that the victim failed to attend school does not prove that Joyce Malcome intended to testify falsely and/or that the State intentionally elicited false testimony. Also, the fact that Khalid actually skipped school and went to the game room was elicited on Danny Smith's cross-examination by the defense.

■ The defendant also claims that Ricardo Walls testified falsely that he was employed by Addell's Subs when he was robbed and shot. Importantly, when this perjury was discovered, the State and defense stipulated that Ricardo was not working for Addell's Subs when he was robbed and shot. Thus, the stipulation made the jury aware that Walls had lied about his employment. It is improbable that this statement affected the outcome of the verdict. Accordingly, the trial court did not err by denying the defendant's motion to dismiss with respect to Walls' testimony.

■ Additionally, the defendant contends that false testimony was adduced that Eric Lockhart was enrolled at Manley High School. It was determined that Lockhart was once a student at Manley High

School, but later dropped out. The parties stipulated that Lockhart was not a student at the time of the trial. Since the truth in this instance was also presented to the jury, in our view, the testimony at issue did not determine the outcome in this case.

■ The defendant further contends that he was prejudiced by the State's closing remarks because it shifted the burden of proof to the defendant. Relative to this issue, the defendant indicated during his closing that the State had made "deals" in exchange for witness testimony. In rebuttal, the State argued that the defendant did not prove or offer any evidence to substantiate those claims. The following statements were made during the State's argument in rebuttal:

> "MR. MURPHY [Assistant State's Attorney]: Ricardo Walls he got five years in the penitentiary. Ladies and gentlemen, we all read the paper, we know about overcrowding, you know the problems the prison system had. If something was going on with Ricardo Walls in the State's Attorney's office regarding his testimony why not call somebody from the Illinois Department of Corrections, call his parole officer.
>
> MR. JONES [Defense Attorney]: Objection, your Honor.
>
> MS. SNOWBERGER [Defense Attorney]: Objection.
>
> THE COURT: I'll sustain your objection at this point.
>
> MR. MURPHY: Where is the evidence, ladies and gentlemen. Eric Lockhart supposedly got a deal on his drug case, he got probation. We heard he had one conviction so he is a first time offender. He got 1040 probation, he is a first time offender. Is that unusual? If there is something going on here why not call someone involved in the case?
>
> MS. SNOWBERGER: Objection.
>
> MR. MURPHY: Call a court reporter.
>
> THE COURT: I'll sustain the objection.
>
> MR. MURPHY: Where is the evidence ladies and gentlemen?"

The defendant objected and the court *sustained* the objections. Defendant's claim fails for two reasons. First, the defendant waived his claim because it was not included in a written posttrial motion. *Enoch*, 122 Ill. 2d at 186-87. Secondly, even if waiver did not apply, the claim fails to establish plain error. The plain error doctrine allows a court to consider an issue that was not properly preserved, but it "does not operate as a general savings clause." *People v. Childress*, 158 Ill. 2d 275, 300, 633 N.E.2d 635 (1994). The plain error doctrine allows a reviewing court to consider a trial error not properly preserved when the evidence in a criminal case is closely balanced or the error is so fundamental and of such a magnitude that the defendant was denied his right to a fair trial. *People v. Miller*, 173 Ill. 2d 167, 191-92, 670 N.E.2d 721 (1996). Improper comment is only plain

error when the comment was either so inflammatory that the defendant could not have received a fair trial or so flagrant that it threatens the deterioration of the judicial process. *People v. Phillips*, 127 Ill. 2d 499, 524, 538 N.E.2d 500 (1989).

The prosecution may attack a defendant's theory of defense during closing arguments and may respond to any statements by defense counsel that invite a response. *People v. Hudson*, 157 Ill. 2d 401, 441-46, 626 N.E.2d 161 (1993). The trial court sustained the defendant's objections to the statements made by the State in rebuttal. See *People v. Carlson*, 79 Ill. 2d 564, 577, 404 N.E.2d 233 (1980) (noting that the court can, by sustaining the objection or instructing the jury to disregard the answer or remark, usually correct the error). Although an improper argument may constitute plain error, even though an objection to the argument has been sustained, in our view, no plain error occurred because the case was not closely balanced nor was the magnitude of the improper argument of such magnitude that the defendant was denied a fair trial.

■ The defendant contends that evidence regarding gang affiliation and characterizing the murder as a gang killing that was allowed by the trial court was erroneous and inflammatory. The defendant also claims that the evidence was unfairly prejudicial, unsubstantiated, and irrelevant. Defendant focuses on testimony that the defendant was a member of the Insane Vice Lords street gang and the State's characterization at opening that this incident was a gang killing. The State made the following statements during its opening:

"MR. DONNELLY [Assistant State's Attorney]: *** [I]t's about a gang killing. But it's not a typical gang killing. It's not a gang killing in which one gang member kills a rival gang member."

The defendant has also waived his claims regarding the gang evidence and the hearsay because he failed to include it in his posttrial motion. *Enoch*, 122 Ill. 2d at 186-87. However, waiver aside, these claims fail on the merits because the defense used the gang evidence as part of its defense theory.

The defense used the gang-related evidence during his opening statements, cross-examination of the State's witnesses and in closing. The defendant stated the following in his opening statements:

"MR. JONES [Defense Attorney]: *** [T]hose witnesses will tell you Brian Doyle never said a word to them. Also there's been reference that Brian Doyle is in the same gang. Well ladies and gentlemen, I want you to listen to these witnesses who will say that 'I seen Brian Doyle once.' 'Well, how do you know him?' 'Well do you know his name?' 'No.' *** [T]he evidence will show that they didn't even know who he was."

The defense elicited the following testimony on cross-examination:

"MR. JONES [Defense Attorney]: Now you say you're a gang member?

MR. WALLS [Witness]: Yes

Q. And you are what is called an Insane; is that right?

A. Yes.

Q. Now, is that spelled i-n-s-a-n-e. Is that insane?

A. Yes.

Q. Was everyone in the game room an Insane?

A. No."

The defense offered this argument in closing:

"MR. JONES [Defense Attorney]: *** [I] submit to you that Danny Smith, Eric Lockhart took over a gang that day. Something went wrong. *** [W]ho did they blame it on? A person who ain't in the gang, a person nobody knows, a person they don't protect."

Relevant evidence is that which has any tendency to make the existence of any fact of consequence to the determination of the action more or less probable than it would be without the evidence. *People v. Peeples*, 155 Ill. 2d 422, 455-56, 616 N.E.2d 294 (1993). Evidence is admissible if it is relevant to a material issue and its probative value is not substantially outweighed by its prejudicial effect. *People v. Burrows*, 148 Ill. 2d 196, 231, 592 N.E.2d 997 (1992). The standard for admitting gang evidence is no different; the evidence is admissible if it is relevant. *People v. Gonzalez*, 142 Ill. 2d 481, 487, 568 N.E.2d 864 (1991). In the instant case, the gang-related evidence tends to establish motive when there would otherwise be no reasonable explanation for the actions. *People v. Nichols*, 235 Ill. App. 3d 499, 506, 601 N.E.2d 1217 (1992). The testimony reflects that the defendant and Khalid argued about Khalid's authority within the Insane Vice Lords gang. The State put forth evidence to show this argument occurred and the defendant returned with a gun and killed Khalid for "putting defendant in his place."

The defendant also claims that it was plain error for the trial court to allow the State to bolster the credibility of its witnesses by using prior consistent statements. The first instance relates to Officer Franklin's testimony that witnesses, both named and unnamed, identified the offender as a black male named Brian. Officer Franklin said: "I talked with a lot of other witnesses that—actually didn't go in our report that didn't want to be named, and they said it was a black male." Here, too, the defendant has waived this issue on appeal because he failed to include it in his posttrial motion. *Enoch*, 122 Ill. 2d at 186-87.

Section 15—12 of the Code of Criminal Procedure of 1963 provides:

"A statement is not rendered inadmissible by the hearsay rule if (a) the declarant testifies at the trial or hearing, and (b) the declarant is subject to cross-examination concerning the statement, and (c) the statement is one of identification of a person made after perceiving him." 725 ILCS 5/115—12 (West 1992).

The officer's testimony that Smith, Walls and Lockhart identified the defendant at the scene shortly after the murders is not hearsay under this statutory provision. Each witness testified at the trial, was cross-examined and made a statement shortly after witnessing the shootings. As to the statements that "unnamed" witnesses identified the defendant at the scene, we agree that those statements are impermissible hearsay. The unnamed witnesses did not testify. Nor were they cross-examined about the identification. However, the defense objected to the statement and the trial court *sustained* the objection. As a result, there is no error because the court properly ruled on the inadmissible hearsay. *People v. Williams*, 181 Ill. 2d 297, 312-13, 692 N.E.2d 1109 (1998). Additionally, there is no plain error.

The defendant also posits that Officer Baltazar's testimony that he observed a subject fitting the description of Bryan Doyle was improper hearsay. Hearsay is an out-of-court statement offered in court to prove the truth of the matter asserted. *Williams*, 181 Ill. 2d at 312-13. The record reflects that the officer received a warrant, issued on April 5, for the defendant's arrest with a description of the defendant. In response to the State's questioning about what the officer observed at the scene of the arrest, the officer replied, "I observed a male black fitting the description we were given of Brian Doyle, exit the building." The description of the defendant was printed on the warrant for his arrest. As the description was contained in the warrant, the description given did not necessarily come from the "unnamed" witnesses, as the defendant suggests. Again, in our view, no plain error occurred.

The defendant also claims that he did not receive effective assistance of counsel because his attorney did not object to the gang evidence and the hearsay. We disagree. The defendant cannot overcome the presumption that his attorney's assistance was adequate on these claims because the evidence relating to the gang activity and membership was part of the defendant's defense theory and therefore part of the trial strategy. The standard for reviewing an ineffective assistance of counsel claim is whether the attorney's conduct fell below an objective standard of reasonableness. *Strickland v. Washington*, 466 U.S. 668, 687-88, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064 (1984). The attorney is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable profes-

sional judgment." *Strickland*, 466 U.S. at 690, 80 L. Ed. 2d at 695, 104 S. Ct. at 2066. In addition, to prove ineffective assistance of counsel, the defendant must show prejudice by demonstrating that it is reasonably likely that, but for his attorney's errors, the decision reached would have been different. *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068. In our view, defendant's claims on this issue fail because the defendant cannot overcome the presumption that his attorney did not object because of the defense theory. Moreover, the defendant cannot meet the two-pronged requirements of *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.

█ The defendant finally claims cumulative error denied him of his rights to a fair trial and due process. The resolution of the general argument that the cumulative effect of various trial errors warrants reversal will depend upon the appellate court's evaluation of the individual errors. *People v. Falconer*, 282 Ill. App. 3d 785, 793, 668 N.E.2d 1095 (1996). Where the alleged errors do not amount to reversible error on any individual issue, there generally is no cumulative error. *Falconer*, 282 Ill. App. 3d at 793. We reject the defendant's claim because our determination is that no individual error is reversible. There is no showing that the alleged errors, either individually or cumulatively, denied the defendant of a fair trail or due process.

Accordingly, the judgment of the circuit court is affirmed. We also grant the State's request for $100 in costs for defending this appeal and incorporate it as part of our judgment. 725 ILCS 5/110—7(h) (West 1998); 725 ILCS 130/13 (West 1994); 55 ILCS 5/4—2002.1 (West 1998).

Affirmed.

COHEN, P.J., and TULLY, J., concur.